FILED

2018 Jun-01  AM 09:46
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **BEVERLY SPENCER; et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 7:16-cv-01334-LSC** |
| | ) | |
| **SHERIFF JONATHAN BENISON;** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT SHERIFF JONATHAN BENISON'S MEMORANDUM BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT AND MOTION FOR REIMBURSEMENT OF FEES AND COSTS PURSUANT TO 42 U.S.C. § 1988

COMES NOW Defendant Sheriff Jonathan Benison and hereby respectfully files this Memorandum Brief in support of his Motion for Summary Judgment and Motion for Reimbursement of Fees and Costs as follows:

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................2

INTRODUCTION ....................................................................................3

STATEMENT OF THE FACTS .................................................................7

STANDARD OF REVIEW ......................................................................16

ARGUMENT ........................................................................................18

I.   QUALIFIED IMMUNITY BARS PLAINTIFF'S CONSTITUTIONAL
     CLAIMS PURSUANT TO 42 U.S.C. § 1983................................18

     A.   Plaintiff's substantive due process claim, contained in Count I, fails to
          show that Plaintiff's risk of harm was so excessive as to invoke his
          Fourteenth Amendment right to protection from the criminal actions
          of a third-party ....................................................................22

     B.   Plaintiff erroneously identifies the Fifth Amendment as a source of the
          plaintiff's rights allegedly offended..................................27

II.  PLAINTIFF'S CONSPIRACY CLAIMS BROUGHT UNDER 42 U.S.C. §
     1983   FAIL   BECAUSE   PLAINTIFF   DID   NOT   PROVE   A
     CONSTITUTIONAL VIOLATION ...........................................27

III. SHERIFF BENISON IS ENTITLED TO REIMBURSEMENT OF ALL
     FEES AND COSTS IN DEFENSE OF THIS CASE PURSUANT TO 42
     U.S.C. § 1988...................................................................29

CONCLUSION .....................................................................................31

CERTIFICATE OF SERVICE ................................................................31

# INTRODUCTION

"You are a genius for how you done that, sold him [Gomez] a piece of property in the middle of his (sic) [your] property." (Exhibit E, Deposition of Andrew Horst, 50: 7 – 9) These words said by Andrew Horst in his deposition perfectly summarize this case. From 2011, Plaintiff has been involved in litigation with Bernard Gomez[1] relating to the sale of property by Plaintiff to Belle Mere Properties for the building and operation of Frontier Bingo in Greene County Alabama. The property sold was located in the middle of Plaintiff's property, and since that time, Plaintiff has fought Gomez and Belle Mere over easement and boundary lines. In other words, Plaintiff created controversy and picked fights. Plaintiff has now manufactured this case, but he expanded his litigation barrage against Gomez and Frontier to include Sheriff Jonathan Benison. His theory is that Sheriff Benison did not take his side in his land dispute with Gomez by arresting the Co-defendants[2] for the misdemeanor offense of Criminal Trespass in the Third Degree. This theory, though, does not constitute a cognizable claim under 42 U.S.C. §1983, and this manufactured case against Sheriff Benison should be dismissed.

The crux of Plaintiff's baseless and defamatory claims is found in the

---

[1] Bernard Gomez is the manager for Belle Mere Properties. (Exhibit G, Deposition of Bernard Gomez, 23: 8 – 10)

[2] Co-defendants Dream, Inc., Belle Mere Properties, LLC, Accuity Capital Group LLC, Bernard Gomez and Che Williamson will be referred to collectively as the "Frontier Bingo Defendants" or the "Frontier Defendants."

following paragraphs:

37. The Defendant, Sheriff Jonathan Benison was called to the location again. When he arrived, Defendant Sheriff ordered Plaintiff Spencer to remove his vehicles and equipment from his (Plaintiff Spencer's) company's property. Defendant Sheriff stated that the vehicles needed to be removed so that customers of the bingo hall could enter and exit the bingo entity's lot. Plaintiff Spencer had ensured that enough of the illegal road was unblocked so that the customers of the bingo hall could enter and exit the parking lot. Plaintiff Spencer only blocked the roadway that encroached on his (Plaintiff Spencer's) company's property. Without regard to the facts, Defendant Sheriff threatened to arrest Plaintiff Spencer if Plaintiff Spencer did not comply with Defendant Sheriff's demand. Defendant Sheriff stated that "his customers" needed access to the property to play bingo and then ejected Spencer from his own premises and ordered and made Spencer, under the threat of immediate arrest, to leave his company's property and to allow the Defendants to continuously and illegally trespass thereon.

38. Defendant Sheriff never asked, ordered, or demanded Defendants DREAM, Belle Mere, Accuity, Gomez, and Williamson to remove their vehicles (the truck and car) from Plaintiffs' property nor did the Sheriff prevent the trespass which he was called upon to do on numerous occasions.

39. Defendant Sheriff also moved Plaintiffs' traffic cones that were on Plaintiffs' property. Defendant Sheriff stated that the cones were hindering customers of Defendants from entering the bingo hall parking lot. At all times pertinent hereto and in fact during the entire history between the Plaintiffs and the Defendants Bingo Hall operators, the Sheriff of Greene County, who is also in charge of all the Bingo Hall gambling operations in Greene County under the Alabama Constitution and rules thereunder (See Exhibit C). His Deputies acted under his direct supervision and instruction and Defendant Sheriff was directly and personally involved in the ongoing conduct of the co-defendant Bingo Hall owners and operators. Defendant Sheriff was personally notified and was aware of the boundaries of ownership of the Plaintiffs' property and had been given the Federal Bankruptcy Court's final order regarding the land and easement boundaries the day after Defendants first sued Plaintiff. The Defendant Sheriff had visited the property

several times during the disputes leading to this suit and was certainly aware that Co-defendant gambling operators had no right to build a road on Plaintiffs' property outside their easement and knew the Defendants had no right to bar the Plaintiffs from their easement across the Bingo Hall property. On each occasion, when the Sheriff came to the property, he observed the illegal trespassing activities, discussed the situation with the parties, and conspired with the Defendants such that they would be allowed to continue their illegal trespass activities on the Plaintiffs' properties. To further the conspiracy, Defendant Sheriff allowed the gambling Co-defendants to continue to illegally trespass on and use Plaintiffs' property to support their gaming operations. Defendant Sheriff individually and in his official capacities, had a direct pecuniary interest in the bingo operation. The Sheriff dealt directly with Defendant Gomez and agreed with him to allow the illegal operation to continue, resulting in the property trespass and due process and other constitutional violations complained of herein.

40. Up to the day of filing of this action, all Defendants continue to trespass upon Plaintiffs' property, to allow their customers to also trespass upon Plaintiffs' property, and to allow drainage of water to flow onto Plaintiffs' property which disturbs and damages Plaintiffs' property. (Doc. 1 ¶¶ 37 – 40)

In other words, because Sheriff Benison did not arrest any of the Defendants (none of which were present at the scene to have been arrested) for criminal trespass, he conspired to deprive Plaintiff of a swath of property that ran along the easement. While the allegations are flimsy, they have no supporting evidence. When asked specifically what evidence he has of a "conspiracy", he testified:

| 21 | Q. | Well, you allege that there was |
| 22 | | a conspiracy between Sheriff Benison, |
| 23 | | Dream, Inc., Belle Mere, Accuity, Bernie |
| 1 | | Gomez, Belle Mere and Che Williamson. My |
| 2 | | question is, you put this in the |
| 3 | | Complaint, what proof do you have of a |
| 4 | | conspiracy? |

5

```
5    A.    Well, the Sheriff deputies up
6          there, we got rid of the place, Mr. Gomez,
7          everyday, you know, and the Sheriff said
8          that was his customers, and the Sheriff
9          takes care of Mr. Gomez and he don't take
10         care of the landowner. And whatever I do,
11         I can't even go on my property, and he
12         told me they was his customers and I
13         believe something is going on.

5    Q.    What is the evidence besides
6          what you have told me? I don't want to
7          repeat questions and get your lawyer upset
8          at me.
9    A.    I can't recall all of it today,
10         but I am sure I got some more.
```

(Exhibit D, Deposition of Beverly Spencer, 64: 21 – 65: 13, 67: 5 – 10)

His "evidence" is that he thinks "something is going on" because the Sheriff "sides" with Bernard Gomez. There are two issues with Plaintiff's schoolyard theory of liability. First, there is no underlying constitutional violation – law enforcement has discretion on when to arrest (assuming that the offense was committed in the Sheriff's presence) and secondly, merely because Sheriff Benison did not interject himself in Plaintiff's boundary dispute with Bernard Gomez, a constitutional claim did not occur. When stripped of its conclusory invective, Plaintiff's theory ultimately amounts to nothing more than simple syllogism: Sheriff Benison did not do what I wanted; ipso facto, *something* must be going on. Plaintiff's schoolyard theory of "if you're not for me you're against me" does not provide a basis for liability in and of itself.

## STATEMENT OF THE FACTS

1.     Plaintiff has been involved in litigation with Bernard Gomez, Dream Inc., (Frontier Bingo) since 2011 over the boundaries of an easement. (Ex. B, Spencer Dep. 105: 6 – 7)

2.     Plaintiff involved law enforcement on multiple occasions regarding his boundary dispute. On April 20, 2012, Plaintiff called 911 because he claimed that someone connected with Frontier Bingo had trespassed on his property by placing a banner, advertising the business, adjacent to the highway. The deputy told Plaintiff that he had no way of verifying the boundaries and knowing if the sign was placed on Plaintiff's property. The deputy told Plaintiff not to remove the banner and that he should go to court and get a court order. (Exhibit O, 4/20/12 Incident and Offense Report, Bates # 18 – 19)

3.     On April 1, 2014, Plaintiff was arrested for criminal trespass. At this time, Frontier Bingo had been closed by the state of Alabama. Plaintiff would drive on the easement and onto the property. On the date at issue, a security guard, Andrew Horst, was monitoring the property. Plaintiff drove onto the easement in his rollback truck. Horst stood in front of Plaintiff to prevent him from entering the property. Plaintiff, though, attempted to run over Horst, who had to jump out of the way. Plaintiff then drove past. Horst signed a complaint and had Plaintiff arrested for criminal trespass. (Ex. E, Horst Dep. 48: 1 – 11, 53: 13 – 54: 2; Exhibit P, 4/1/14

Incident and Offense Report, Bates # 22 & 23; Exhibit Q, 4/1/14 Arrest Report, Bates # 45 – 46)

4.     On January 13, 2016, Plaintiff called the Greene County Sheriff's Office and reported that a white male subject was driving a bulldozer and trespassing on his property. (Exhibit R, 1/13/16 Incident and Offense Report)

5.     This call concerned the driveway that followed a powerline and connected Frontier Bingo to U.S. Highway 11. (Exhibit H, Aerial Photograph of Area)

6.     When Frontier purchased the property, which was landlocked in the middle of Plaintiff's property, it was granted a 25 foot easement that ran aside a powerline connecting it to U.S. Highway 11. (Exhibit B, Spencer Dep 19: 14 – 20: 20, 31: 16 – 32: 3)

7.     Deputy Jeffrey Grant responded to Plaintiff's January 13, 2016 call. (Exhibit D, Deposition of Jeffery Grant 25:1)

8.     When he arrived, Deputy Grant spoke with Plaintiff who informed him that someone was on a bulldozer moving dirt. The person was not present when Deputy Grant arrived. (Ex. D, Grant Dep. 23: 13 – 16; Ex. R)

9.     The road in issue went straight up a hill from U.S. Highway 11 but at a steep incline. It appeared to Deputy Grant that work was being done to put a curve in so that the incline was not as steep. (Ex. D, Grant Dep. 26: 4 – 7)

10.     Deputy Grant was not shown a copy of the Federal Bankruptcy order that purportedly established the lines of the easement. (Ex. D, Grant Dep. 27: 17 – 20)

11.     If Deputy Grant had been shown the order, it would not have helped because he would not have known where the lines were located. (Ex. D, Grant Dep. 29: 17 – 20)

12.     Deputy Grant talked subsequently to Tony Boshell, the bulldozer operator, who agreed to stop working. (Ex. D, Grant Dep. 35: 8 – 19; Ex. R)

13.     Boshell told Grant that he had been hired by Bernard Gomez to level off the property and make the roadway longer and that he did not know about the property lines. (Ex. R)

14.     Gomez hired Boshell to build the road. The road ran aside the powerlines, and it needed to be moved because the power company owned a 15 foot right of way to each side of the line. (Exhibit F, Deposition of Tony Boshell 29: 14 – 18)

15.     Boshell did the measuring to determine where to expand the road. He measured 25 feet from the 15 foot right of way. (Ex. F, Boshell Dep. 31: 6 – 14, 48: 15 – 18)

16.     Boshell could see that the existing road was too narrow. (Ex. F, Boshell Dep. 30: 14)

17.     Boshell intended not to go beyond the 25 feet easement when building the road. (Ex. F, Boshell Dep. 48: 19 – 22)

18.     When doing the work, Boshell only bulldozed small brush and no sizable trees. (Ex. F, Boshell Dep. 46: 14 – 22)

19.     In Plaintiff's opinion, the trees were not merchantable timber. (Ex. B, Spencer Dep. 92: 4 – 8)

20.     When asked each time by the deputies and the Sheriff to stop working, Boshell stopped building the road. (Ex. F, Boshell Dep. 38: 18 – 23, 41: 20 – 23, 49: 17 – 50:1)

21.     Deputy Grant only spoke to Boshell and Plaintiff. Gomez was not present at the scene, and Grant did not speak to him. (Ex. D, Grant Dep. 35: 20 – 36: 5)

22.     Deputy Grant determined that Plaintiff's complaint was a civil boundary dispute and not criminal conduct. (Ex. R)

23.     On January 18, 2016, Deputy Charlie Davis responded to another call made by Plaintiff. Plaintiff stated that Gomez is still moving dirt and building a road and is building on his side of the property line. (Exhibit S, 1/18/16 Incident and Offense Report)

24.     Deputy Davis asked the operator to stop working until the boundary dispute was taken care of. The man agreed to stop moving dirt that day. (Exhibit C,

Deposition of Charlie Davis 34: 9 – 15, 39: 14 – 40: 5)

25.     A series of photographs were taken that day, showing the work that was done. (Exhibits I – N, Photographs of the Scene)[3]

26.     Deputy Davis concluded that the dispute was a civil matter and did not meet the elements of criminal trespass because he felt that the bulldozer operator's (Boshell's) conduct was not intentional. (Ex. C, Davis Dep. 43: 23, 50: 1 – 2)

27.     On February 24, 2016, Sheriff Benison went to the scene at Frontier Bingo in response to another call made by Plaintiff reporting criminal trespass on his property.[4] (Exhibit A, Deposition of Jonathan Benison 88: 5 – 11)

28.     Sheriff Benison does not recall receiving the Bankruptcy order that purportedly established the boundaries to the easement. If he had, the order would not have been important to him because he does not know anything about surveying land and because the order was not directed at him. (Ex. A, Benison Dep. 83: 13 – 86: 15)

29.     Plaintiff, through his son, secretly recorded his interaction with Sheriff Benison. (Ex. B, Spencer Dep. 111: 19 – 112: 12; Exhibit V, Audio of Recording 1;

---

[3] From the photographs and testimony in this case, improvements were being made to the road, which would have benefitted Plaintiff because an improved road would have been on his property. (Ex. B, Spencer Dep. 117: 20 – 23)

[4] Deputy Davis described Plaintiff's persistent, and likely illegal, use of 911 to report non-emergencies. He testified, "It is a civil matter and I have been working there 23 years and this is not the first one [boundary dispute] that we done dealt with. But this is probably the first one where repeatedly calls were made to 911…." (Ex. C, Davis Dep. 43: 23 – 44: 4)

Exhibit X, Audio of Recording 2; Exhibit Z, Audio of Recording 3)

30.     On the date the Sheriff was at the scene, work was being done to replace a water line, which ran alongside the easement. (Ex. G, Gomez Dep. 102: 10 – 15)

31.     Sheriff Benison remembered that the driveway was "messy." (Ex. A, Benison Dep. 90:19 – 91: 2)

32.     Plaintiff claimed that "they" [Frontier Bingo] had covered up their road. (Ex. B, Spencer Dep. 68: 15 – 16)

33.     Plaintiff had pulled his bulldozer on "his property" and his son and brother had parked their vehicles as well. Additionally, Plaintiff had put out cones. (Ex. B, Spencer Dep. 70: 13 – 17, 114: 9 – 12; Exhibit Y, Transcript of Audio Recording 3 3: 13 – 4: 13; Exhibit Z, Audio Recording 3)

34.     Bernard Gomez estimated that the position of the bulldozer, cones, and vehicles left approximately 15 feet on the road; two vehicles could not pass. (Ex. G, Gomez Dep. 92: 12 – 21)[5]

35.     Traffic was stopped on U.S. Highway 11, with two or three cars in each of the lanes, because cars could not enter and leave the drive. (Ex. G, Gomez Dep. 95: 11 – 20)[6]

---

[5] Apparently, Plaintiff took advantage of the work being performed on the water line, which impacted the traffic flow. He then moved his bulldozer, placed cones, and allowed his brother and son's vehicles to park on "his side" of the easement, which further constricted ingress and egress into Frontier Bingo.

[6] Plaintiff agreed that the traffic was backed up on U.S. Highway 11. (Ex. B, Spencer Dep. 67:14 – 68 22)

36.     The drive into Frontier Bingo is at the bottom of a hill from both directions on U.S. Highway 11. (Ex. G, Gomez Dep. 96: 3 – 4)

37.     Gomez does not remember seeing or speaking with Sheriff Benison at the scene on February 24, 2016. (Ex. G, Gomez Dep. 72: 23 – 73: 4)

38.     At the scene, Sheriff Benison stated to Plaintiff, "You know all this is about safety, right? Y'all understand that?" (Exhibit U, Transcript of Audio Recording 1 3: 8 – 10)

39.     Sheriff Benison expressed concern that because the cones were placed in the middle of the road, vehicles could not get to the business if the road was blocked and if someone was sick. (Ex. U, 14: 18; Ex. V; Ex. W, 3: 13 – 16; Ex. X)

40.     Sheriff Benison was concerned that people could not get in and out of the driveway. (Ex. U, 7: 16 – 18)

41.     Sheriff Benison told Plaintiff that he could not block the driveway and keep customers from getting in and out and keep the fire department or OSHA from entering. (Ex. B, Spencer Dep. 63: 16 – 23)

42.     While at the scene, Sheriff Benison spoke by telephone with Bobby Cockrell, the Plaintiff's attorney.[7] (Ex. U, 25: 5 – 26: 15; Ex. V)

43.     Plaintiff's recording captured Sheriff Benison's portion of the

---

[7] Because Plaintiff's counsel, Bobby Cockrell (referred to by Sheriff Benison as "Cochran"), spoke to Sheriff Benison while he was at the scene and discussed that Plaintiff would be obtaining an injunction, Mr. Cockrell is a witness in this case. (Ex. U, 25: 5 – 26: 15)

telephone conversation (Ex. U, 25: 5 – 26: 15; Ex. V):

5     (Inaudible) Mr. Cochran.
6     (Speaking to someone on phone:)
7     Yeah. Sheriff Joe Benison, Greene County.
8     How are you doing? Right. I'm trying to
9     get this situation solved up here at
10    Frontier with Mr. Beverly Spencer at
11    (inaudible). Oh, you just spoke with him?
12    Okay. Okay. Mm-hm. Okay. Okay. So --
13    so you talked to Flint (phonetic) and
14    there's supposed to be an injunction or
15    something. That's what y'all are trying
16    to do or you can't get one -- oh, you --
17    oh, you're working on them now? Okay.
18    UNKNOWN SPEAKER: (Inaudible)
19    injunction.
20    UNKNOWN SPEAKER: Yeah.
21    SHERIFF JONATHAN BENISON: (Speaking
22    to someone on phone:) Okay. So you
23    talked to -- okay. So you talked to Ken
1     today, right? And you talked to Flint?
2     Okay. Y'all friends. That's -- okay.
3     Okay. So -- okay. So if Aycock agreed to
4     a self-serve, y'all are going to try to
5     get an injunction? Okay. All right.
6     What I'm saying, y'all think y'all will
7     get that today? You think y'all will get
8     that today? Okay. Okay. Sounds good.
9     That sounds good. Well, he might can get
10    him. I got him --
11    See if you can get in with him so he
12    can let Bev know so we can get some
13    closures in this? Okay? Yeah, I'm sick
14    of it. 911's sick of it and everybody
15    else.

44.    After Sheriff Benison's conversation with Plaintiff's counsel, the

following exchange occurred (Ex. U, 28: 1 – 23; Ex. V):

14

```
1     SHERIFF JONATHAN BENISON: All
2     right. I just talked to him. He just
3     talked to Flint. He just talked to
4     Aycock. They're in the process of trying
5     to get up with Judge Hardaway with the
6     injunction. Aycock agreed to a
7     self-service on that injunction. So that
8     means that pretty well solves it. He
9     said, well, if it's not good with Judge
10    Hardaway, I'll know soon. I can't ask for
11    no more.
12    BEVERLY SPENCER: Well, can I ask
13    you a question?
14    SHERIFF JONATHAN BENISON: Go ahead.
15    BEVERLY SPENCER: If we get an
16    injunction, they're on my land, what will
17    (inaudible)?
18    SHERIFF JONATHAN BENISON: What am I
19    going to do with an injunction? I can't
20    say what I'd say. (Inaudible) anything
21    about it until I know what the attorney
22    says.
23    BEVERLY SPENCER: That's good.
```

45.    Plaintiff spoke with Alabama State Trooper Shon Minor at the scene who told Plaintiff that Sheriff Benison should not have been involved in the matter because it was a civil dispute. (Ex. B, Spencer Dep. 130: 3 – 5, 16 – 23)[8]

46.    Sheriff Benison stated that he would arrest someone for disorderly conduct because the recordings reflect that someone connected with Plaintiff was disrespectful to an officer. (Ex. U, 15: 12 – 15, 16: 6 – 8; Ex. V)

---

[8] Trooper Minor was correct that this dispute is civil and not criminal. The recordings indicate that Sheriff Benison expected that Plaintiff would seek an injunction, but he did not. Instead, he filed this meritless suit.

47.     Sheriff Benison also stated the following about arresting Plaintiff (Ex. U, 16: 15 – 20):[9]

```
15    SHERIFF JONATHAN BENISON: You
16    better not block that road. I guarantee
17    you that. You can't hold them folks --
18    you're going to be charged with a felony.
19    I'm telling you. If you block them folks
20    in there –
```

48.     Sheriff Benison has never taken a trip with Bernard Gomez. (Ex. A, Benison Dep. 43: 16 – 22)

49.     Sheriff Benison has family that works for every bingo establishment; his son works for Frontier, but Sheriff Benison has no input on the hiring at the bingo establishments. (Ex. A, Spencer Dep. 62: 5 – 6, 69: 1 – 2; Ex. G, Gomez Dep. 57: 10 – 11)[10]

50.     Plaintiff never sought a warrant or signed a complaint against Gomez or Boshell. (Ex. B, Spencer Dep. 52: 19 – 53: 4)

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and

---

[9] Plaintiff has misrepresented Sheriff Benison's comment in his Complaint. Plaintiff was not threatened with arrest because he parked his bulldozer around the driveway. He was threatened with arrest for blocking people in and preventing them from leaving. Figuratively, Plaintiff was holding Frontier's customers hostage to settle his boundary dispute.

[10] Greene County is the least populated in Alabama. The fact that Sheriff Benison has family members that work in the bingo establishments should not be surprising as there are not a lot of employment opportunities in Greene County.

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party requesting summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the non-moving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories and admission on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## ARGUMENT

## I.   QUALIFIED IMMUNITY BARS PLAINTIFF'S CONSTITUTIONAL CLAIMS PURSUANT TO 42 U.S.C. § 1983.

The purpose of [qualified] immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).   "Qualified immunity offers 'complete protection for government officials sued in their individual capacities as long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vineyard v. Wilson, 284 F.3d 1188, 1346 (11th Cir. 2002) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

To be eligible for qualified immunity, the officers must demonstrate that they were acting in the scope of their discretionary authority.  O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004).  "To determine whether an official was engaged in a discretionary function, [courts] consider whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'" Crosby, 394 F.3d

at 1332 (citing <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1265 (11th Cir. 2004)).  In applying this test, courts should look to the "general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." <u>Holloman</u>, 370 F.3d at 1266.   "[t]he determination that an officer was acting within his discretionary authority is quite a low hurdle to clear."  <u>Godby v. Montgomery County Bd. of Educ.</u>, 996 F. Supp. 1390, 1401 (M.D. Ala. 1999).  In this case, this burden is clearly met. The allegations asserted are that Sheriff Benison threatened to arrest Plaintiff but "sided" with the Frontier Defendants by not arresting them for trespass. The power to arrest falls within the Sheriff's discretionary authority.[11]

Once determined that officers acted within their discretionary authority, courts use a two-part test to determine whether qualified immunity is proper.  In <u>Saucier v. Katz</u>, the Supreme Court directed courts to use the following two-part test to determine whether qualified immunity applies: first, the court determines whether there was a constitutional violation; second, the court determines whether the

---

[11] Of course, Plaintiff failed to present any evidence that Bernard Gomez or Che Williamson trespassed on his property in the Sheriff's presence. <u>Ala. Code</u> § 13A-7-4 (1975) provides that a person commits the crime of Criminal Trespass in the Third Degree when he knowingly enters or remains unlawfully in or upon premises. It is a violation, which is less in severity than a misdemeanor. Under Alabama law, a law enforcement officer can only arrest a person for a misdemeanor or a violation if it was committed in his presence. <u>Ala. Code</u> § 15-10-3 (1975). In this case, Plaintiff testified that no work was being done on his side of the road when the Sheriff arrived; consequently Sheriff Benison did not observe anyone on Plaintiff's purported property. (Ex. B, Spencer Dep. 33: 4 – 15)

constitutional right in question was clearly established.  533 U.S. 194, 201 (2001).

The Supreme Court, however, has abandoned the rigid order of analysis enunciated

in <u>Saucier</u> and stated that courts are no longer required to first determine whether

there was a constitutional violation.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009).

> On reconsidering the procedure required in <u>Saucier</u>, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

<u>Pearson</u>, 555 U.S. at 236.

Should this Court determine that Defendants' conduct violated Plaintiff's

constitutional rights, qualified immunity applies because they did not receive fair

warning that their conduct was unlawful.  Plaintiff bears the burden of demonstrating

clearly established law gave the Defendants fair warning in either of two ways.  First,

Plaintiff can point to a case with materially similar facts holding that the conduct

engaged in was illegal.  <u>Storck v. City of Coral Springs</u>, 354 F.3d 1307, 1317 (11th

Cir. 2003).   Second, in absence of case law, Plaintiff must demonstrate that a

pertinent federal statute or constitutional provision is specific enough to demonstrate

their conduct was illegal.  <u>Storck</u>, 354 F.3d at 1317.  The Eleventh Circuit has

identified the latter method as an "obvious clarity" case.  <u>Vinyard v. Wilson</u>, 311

F.3d 1340, 1350 (11th Cir. 2002).  In order to show that the Defendants' conduct

was unconstitutional with obvious clarity, "the unlawfulness must have been apparent." Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Kelly v. Curtis, 21 F.3d 1544, 1550 (11th Cir. 1994). "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." Storck, 354 F.3d at 1318.

Plaintiff's claims are based on four erroneous, if not fictional, assertions:

1.   Sheriff Benison threatened to arrest Plaintiff for merely having his bulldozer blocking his side of the easement.

2.   Sheriff Benison arrested Plaintiff for criminal trespass in April 2014.

3.   Sheriff Benison allowed the Frontier Bingo defendants to trespass on his property by not arresting them and siding with them.

4.   Sheriff Benison did not follow or embrace the establishment of the easement by the bankruptcy court.

To prevail on his claim, Plaintiff must point to a case that is materially similarly to the facts of the instant case that puts the issue "beyond debate." District of Columbia v. Wesby 583 U.S. ___ (2018). Plaintiff will never meet this burden. First, it must be noted that the assertions in the Complaint were false, as shown by

Plaintiff's recordings. Sheriff Benison never threatened to arrest Plaintiff for having his bulldozer on his property – he was threatened with arrest for disorderly conduct and for blocking the road and preventing ingress and egress including, potentially, emergency vehicles. Sheriff Benison never arrested Plaintiff for trespass; his arrest stemmed from a complaint signed by Andrew Horst in April 2014.[12] As for the bankruptcy order, Sheriff Benison testified that it had no impact on him because he had no way to verify it. He is a law enforcement officer – not a land surveyor. To think that he has to read, understand, and accept a legal land description and use it to make arrests is beyond ridiculous. What Plaintiff wants in this case is for Sheriff Benison to have taken his side and made arrests on the one occasion that he was at the scene. He wanted him to take sides and make arrests despite that Plaintiff's counsel (and signatory to this baseless suit) informed Sheriff Benison that Plaintiff would go to court and obtain an injunction. Simply, Plaintiff cannot point to a case that supports his manufactured claim that Sheriff Benison violated his civil rights.

  **A.** **<u>Plaintiff's substantive due process claim, contained in Count I, fails to show that Plaintiff's risk of harm was so excessive as to invoke his Fourteenth Amendment right to protection from the criminal actions of a third-party.</u>**

   Plaintiff's claims are rooted in the Due Process Clause of the Fourteenth Amendment because Sheriff Benison took "sides" by failing to arrest the Frontier

---

[12] If Plaintiff is attempting to make his arrest a constitutional claim, it is barred by the statute of limitations, which is two years. The incident took place on April 1, 2014; Plaintiff filed his Complaint on August 16, 2016. <u>Wallace v. Kato</u>, 549 U.S. 384 (2007).

Defendants but threatened to arrest him. "The Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." Waddell v. Hendry County Sheriff's Office, 329 F.3d 1300, 1305 (11th Cir. 2003) (citing County of Sacramento v. Lewis, 523 U.S. 833 (1998). The Due Process Clause acts "as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." Waddell, 329 F.3d at 1305 (citing DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989)). However, "[n]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." Waddell, 329 F.3d at 1305. Thus, individuals generally lack "a constitutional right under the Fourteenth Amendment to be protected from the criminal acts of third parties." Vaughn v. City of Athens, 176 F. App'x 974, 977 (11th Cir. 2006) (citing Mitchell v. Duval County Sch. Bd., 107 F.3d 837, 838 (11th Cir.1997)). Furthermore, governmental actors "automatic duty" to protect individuals from the criminal acts of third parties "is limited to custodial relationships: "those which arise from the incarceration of prisoners or other forms of involuntary confinement through which the government deprives individuals of their liberty and thus of their ability to take care of themselves." Vaughn, 176 F. App'x 974, 977 (citing White v. Lemacks, 183 F.3d 1253, 1257 (11th Cir. 1999)). In this case, Plaintiff was not in the custody of law enforcement.

Based on the aforementioned precepts, the Eleventh Circuit has held that non-custodial individuals, such as Plaintiff, can be deprived of due process rights only where governmental actors' conduct "can be characterized as arbitrary or conscience shocking in a constitutional sense."  Vaughn, 176 F. App'x at 977 (citing Waddell, 329 F.3d at 1305).[13]  To show a plausible claim under this exceptionally high standard "*at the very least*, require[s] a showing of deliberate indifference to an extremely great risk of serious injury."  Vaughn, 176 F. App'x 977 (emphasis in original).  "Only the most egregious official conduct" rises to the conscience-shocking level and "even intentional wrongs seldom violate the Due Process Clause."  Waddell, 329 F.3d at 1305.  Thus, "[t]o act with deliberate indifference, a state actor must know of and disregard an excessive—that is, an extremely great—risk to the victim's health or safety."  Id. at 1306.

In this case, Plaintiff failed to show that Sheriff Benison's conduct arose to the level of "constitutional conscience shocking."  Under the facts shown, Sheriff Benison did not take sides in a civil dispute where he was informed by Plaintiff's counsel, Bobby Cockrell, that Plaintiff would be seeking an injunction, which was a reasonable solution. "[T]he benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the

---

[13] Although unclear from the Complaint, to the extent that Plaintiff's failure to protect claim may be based upon the theories of "special relationship" or "state created danger," the Eleventh Circuit has held such doctrines, although once recognized, have been superseded and are no longer valid. Vaughn, 176 F. App'x at 976 n.1 (citing Waddell, 329 F.3d at 1305).

Due Process Clause, neither in its procedural nor in its 'substantive' manifestations." Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 768 (2005). In Town of Castle Rock, Colo., the Court affirmed dismissal of a complaint brought by a mother wherein it was alleged that police officers' failure to enforce a domestic abuse restraining order enabled her estranged husband the opportunity to murder their children. 545 U.S. at 751-55. In so doing, the Court explained that "the Due Process Clause does not protect everything that might be described as a 'benefit' . . . . [and] a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." Id. at 756. The court explained that there exists a "deep-rooted nature of law-enforcement discretion" even in the presence of seemingly mandatory arrest statutes. Id. at 761. The Court thus held that the plaintiff, "for purposes of the Due Process Clause, have a property interest in police enforcement of the restraining order against her husband." Id.

The principle set forth in Town of Castle Rock was applied by the 11th Circuit to instances concerning land disputes. In Crystal Dunes Owners Ass'n v. City of Destin, Fla. et al, 476 Fed. Appx. 180 (11th Cir. 2012), the owners association brought a § 1983 action against city and county sheriff's office for deprivation of due process and equal protection because law enforcement did not enforce the trespass laws within twenty feet of the wet sand's edge. The owners association alleged that members of the public entered their private beach front and remained

there after being asked to leave. The owners asked local law enforcement in assistance to remove the trespassers. However, the policy of local law enforcement was not to enforce the 20 feet wet sands edge law – even where someone was clearly beyond it and trespassing. Consequently, the owners received no assistance from law enforcement despite their repeated requests. The 11th Circuit found that the owners' claims do not arise to a due process claim because the benefit of having someone arrested does not trigger the due process clause. Id. at 183. Likewise, state law did not require an arrest. In short, the authority to arrest falls squarely under the discretion of the officer. Id. at 184.

Crystal Dunes is dispositive of the instant case. The allegations in Crystal Dunes are that law enforcement saw and knew that members of the public were trespassing but did nothing. In this case, Sheriff Benison never saw the alleged trespass, but most pertinently, the boundary line could not be discerned without the benefit of a legal description and a survey. It is not where there is a clear demarcation, such as "wet sand." Rather, the description is found in a court order that was not directed to Sheriff Benison and not read by him. Likewise, Alabama law does not require that law enforcement must arrest for criminal trespass. To the contrary, it requires that the offense must be committed in the presence of the officer before an arrest could even be made, and even then, the statute does not require an arrest. Ala. Code §§ 15-10-3 and 13A-7-4 (1975). If an arrest or relief is not required

26

under Crystal Dunes, it certainly does not here. In short, Plaintiff has not shown a constitutional violation, and he certainly has not shown a violation of clearly established law.

### B. Plaintiff erroneously identifies the Fifth Amendment as a source of the plaintiff's rights allegedly offended.

Throughout his Complaint, Plaintiff lists the Fifth Amendment as one of the bases of his claim; he is in error. Section 1983 is not a source of substantive rights; rather, it merely provides a method for the vindication of rights elsewhere conferred in the United States Constitution. Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617 (1979). Thus, to plead a plausible claim, the first step for any plaintiff is to identify the specific constitutional right allegedly violated. Albright v. Oliver, 510 U.S. 266, 271 (1994). In this case, the Complaint, in addition to alleging a constitutional violation of the Fourteenth Amendment, identifies the Fifth Amendment as a source of the Plaintiff's rights allegedly offended. The Fifth Amendment cannot apply, however, because the Fifth Amendment applies to cases involving federal defendants. Knoetze v. United States, Dep't of State, 634 F.2d 207, 211 (5th Cir. 1981) (noting that Fifth Amendment protection "attaches only when the federal government seeks to deny a liberty or property interest).

### II. PLAINTIFF'S CONSPIRACY CLAIMS BROUGHT UNDER 42 U.S.C. § 1983 FAIL BECAUSE PLAINTIFF DID NOT PROVE A CONSTITUTIONAL VIOLATION.

In Count II of his Complaint, Plaintiff alleged a conspiracy between Sheriff

27

Benison and the Frontier Bingo Defendants for conspiring to deprive him of his property. Of course, Plaintiff's evidence is nonexistent. He only offered hunches and beliefs that "something must be going on" and no proof. In support of his hunches, he asserted that the Greene County Sheriff's Office receives money from the bingo operations and attached <u>Alabama Constitution</u> Amendment 743 and the rules and regulations established by Sheriff Benison.[14] He has not received any payment or favor that is not authorized. In this case, Plaintiff has no evidence and has shown no constitutional violation.

"A plaintiff may state a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right. <u>GJR Invs., Inc. v. County of Escambia</u>, 132 F.3d 1359, 1370 (11th Cir.1998). "The plaintiff attempting to prove such a conspiracy must show that the parties 'reached an understanding' to deny the plaintiff his or her rights. The conspiratorial acts must impinge upon the federal right; the plaintiff must prove an actionable wrong to support the conspiracy." <u>Grider v. City of Auburn, Ala.</u>, 618 F.3d 1240, 1260 (11th Cir. 2010); <u>see also</u> <u>Bailey v. Bd. of County Comm'rs of Alachua County</u>, 956 F.2d 1112, 1122 (11th Cir.1992) (stating "the linchpin for conspiracy is agreement"). To prevail on a § 1983 conspiracy claim, "a

---

[14] In addition to the Greene County Sheriff's Office, the Greene County Board of Education, the Greene County Commission, the local hospital, every municipality in Greene County, and other charities receive assessments from bingo operations.

plaintiff must show an underlying actual denial of [her or his] constitutional rights," and "that the defendants reached an understanding to deny the plaintiff's rights." Hadley v. Gutierrez, 526 F.3d 1324, 1332 (11th Cir. 2008) (citations and internal quotation marks omitted).

Additionally, "[t]he conspiratorial acts must impinge upon the federal right; the plaintiff must prove an actionable wrong to support the conspiracy." Grider, 618 F.3d at 1260. Thus, a plaintiff alleging a § 1983 conspiracy must show that the conspiracy "resulted in the actual denial of some underlying constitutional right." Id. (citing GJR, 132 F.3d at 1370). "[T]here can be no valid claim for a conspiracy to violate Plaintiff's rights in the absence of an underlying constitutional violation." Nassar v. Fla. Dep't of Agric., No. 4:17CV47-MW/CAS, 2018 WL 548974, at *5 (N.D. Fla. Jan. 10, 2018), report and recommendation adopted sub nom. Nassar v. Fla. Dep't of Acrigulture, No. 4:17CV47-MW/CAS, 2018 WL 547643 (N.D. Fla. Jan. 24, 2018) (citing Grider, 618 F.3d at1260; GJR, 132 F.3d at 1370).

In this case, Plaintiff offered no evidence of an understanding and as noted above, cannot show a constitutional violation. He has nothing. Thus, Sheriff Benison is entitled to summary judgment as to Count II.

## III.  SHERIFF BENISON IS ENTITLED TO REIMBURSEMENT OF ALL FEES AND COSTS IN DEFENSE OF THIS CASE PURSUANT TO 42 U.S.C. § 1988.

42 U.S.C. § 1988 authorizes that a defendant may receive reimbursement of

attorney fees and costs when defending a frivolous case. This case qualifies. Plaintiff is seeking monetary damages and declaratory relief over a boundary dispute wherein Plaintiff's counsel told Sheriff Benison that Plaintiff would be seeking an injunction in Greene County to resolve the issue. Plaintiff's decision to drag Sheriff Benison into his boundary dispute over the width and location of an easement (which appears to be a dispute over, at most, 75 feet) is more than petty, it is shocking and unsupported by the facts and law. The decision to award attorney fees to the defendant lies within the discretion of this Court. In deciding this Court should consider 1) whether the plaintiff established a prima facie case, 2) whether the defendant offered to settle,[15] and 3) whether the action was decided on dispositive motion and not at trial. Head v. Medford, 62 F. 3d 351, 356 (11th Cir. 1995); Bailey v. Hughes, 815 F. Supp. 2d 1246, 1272 (M.D. Ala. 2011). All of the criteria are met, if this Court grants Sheriff Benison's Motion for Summary Judgment. This case never should have been brought. The resources of the Greene County Sheriff's Office should not have been wasted in defense of this frivolous case. Sheriff Benison urges this Court to send a message that Plaintiff should not mire the Court and him into his petty disputes.

---

[15] To the contrary, Sheriff Benison has urged the Plaintiff to dismiss him from this action.

## CONCLUSION

WHEREFORE, based upon the foregoing, Sheriff Benison requests that this Honorable Court enter summary judgment in his favor and thereupon issue an order assessing all fees and costs against Plaintiff.

Respectfully submitted this 1st day of June 2018.

**/s/ J. Randall McNeill**
J. RANDALL MCNEILL (ASB-4841-E29J)
Attorney for Defendant
Sheriff Jonathan Benison
WEBB & ELEY, P.C.
7475 Halcyon Pointe Drive (36117)
Post Office Box 240909
Montgomery, Alabama 36124
(334) 262-1850 T
(334) 262-1772 F
rmcneill@webbeley.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will provide notice to the following CM/ECF participants:

Bobby H. Cockrell, Jr., Esq.
Jonathan D. Townsend, Esq.
G. Scotch Ritchey, Jr., Esq.
COCKRELL, COCKRELL
TOWNSEND & RITCHEY
1409 University Blvd.
Tuscaloosa, AL  35401
cockrell1@aol.com
jtownsend@cockrellandcockrell.com
sritchey@cockrellandcockrell.com

E. Kenneth Aycock, Jr., Esq.
E. KENNETH AYCOCK, P.C.
P. O. Box 21134
Tuscaloosa, AL  35402
ken@heritagetitleservice.com

Mark A. Scogin, Esq.
ESPY, NETTLES, SCOGIN &
 MCWILLIAMS, PC
2728 8th Street
Tuscaloosa, AL  35401
scoginlaw@gmail.com

**/s/ J. Randall McNeill**
OF COUNSEL